IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ODON HOLDINGS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 5:25-cv-00557 |
| | § | |
| LDC HEALTH SOLUTIONS, LLC, | § | |
| CHRISTIANA JURCA, ISAIAH J. JURCA, | § | |
| AND DAVID PADILLA, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF ODON HOLDINGS LLC'S ORIGINAL VERIFIED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff ODON HOLDINGS LLC ("Odon") files this its Original Verified Complaint against Defendants LDC Health Solutions, LLC, Christiana Jurca, Isaiah J. Jurca, and David Padilla, and respectfully shows as follows:

**I.**
**PARTIES**

1.     Plaintiff Odon Holdings LLC ("Odon") is a limited liability company organized under the laws of the State of Delaware. Samuel Jurca, D.O. ("Dr. Jurca") is the sole member of Odon. Dr. Jurca is a resident of the State of Idaho. He currently resides in Eagle, Idaho.

2.     Defendant LDC Health Solutions LLC ("LDC") is a limited liability company organized under the laws of the State of Texas. LDC's members are as follows: (1) Christiana Jurca, who is a Texas resident, and (2) David Padilla, who is a Texas resident. LDC may be served with process through its registered agent, R. Michael Casseb, at 7744 Broadway St., Suite 203, San Antonio, Texas 78209.

1

3.    Defendant Christiana Jurca ("C. Jurca") is an individual who resides in Texas and who may be served at her residence at 114 Wildrose Hill, Boerne, Texas 78006 or wherever she may be found.

4.    Defendant Isaiah J. Jurca ("I. Jurca") is an individual who resides in Texas and who may be served at his residence at 114 Wildrose Hill, Boerne, Texas 78006 or wherever he may be found.

5.    Defendant David Padilla ("Padilla") is an individual who resides in Texas and who may be served at his residence at 4010 Heights View Dr., San Antonio, Texas 78230 or wherever he may be found.

## II.
## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7.    Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims asserted occurred in the Western District of Texas.

## III.
## BACKGROUND FACTS

### A. Odon's Wound Care Services Business Through Nexus Affiliates.

8.    Odon, through its subsidiaries and affiliates, employs and/or engages health care providers who specialize in wound care and related services ("Wound Care Services") to provide Wound Care Services, including skin grafts, to patients who are referred to Odon by other medical professionals and healthcare facilities.  At all relevant times, Dr. Samuel Jurca ("Dr. Jurca"), an

Idaho resident, was the Chief Executive Officer of Odon.  At all relevant times, Dr. Jurca was also

the Chief Executive Officer of Nexus MSO, LLC ("MSO"), a Delaware limited liability company,

which is affiliated with Odon.

9.    Odon currently operates in 10 states: Arizona, California, Florida, Idaho, Louisiana,

Nevada, Oregon, Texas, Virigina, and Washington.  Odon operates through separate affiliates

organized under the laws of each state where Oden maintains operations.  In Texas, Odon's

affiliate is Nexus Health Partners, PLLC, a Texas entity.  In the Wound Care Services industry as

a whole, Odon's network of affiliates is known as Nexus Wound Consultants ("Nexus").

**B.  Odon's Exclusive Wound Care Services Marketing Agreement with LDC.**

10.    LDC is a marketing company in the Wound Care Services industry that was

originally created and organized for the express purpose of marketing Nexus' services in the

Wound Care Services industry as set forth more fully below.  LDC was organized on October 5,

2023.  LDC's principals and Managers are: (1) I. Jurca, who is Dr. Jurca's cousin; (2) C. Jurca,

who is I. Jurca's wife; and (3) David Padilla.

11.    On October 20, 2023, Odon, its subsidiaries and affiliates (including Nexus)

entered into an Exclusive Marketing Agreement with LDC ("Agreement"), a true and correct copy

of which is attached hereto as Exhibit "A" and is hereby incorporated by reference.  The term of

the Agreement was for an initial term of one (1) year following the Effective Date, with an

autorenewal for successive one (1)-year terms unless either party provided notice of intent not to

renew the Agreement at least ninety (90) days prior to the expiration of the applicable term.

12.    Under the terms of the Agreement, LDC agreed to provide marketing services

exclusively to Nexus for the purpose of increasing the awareness of Nexus' capabilities to provide

Wound Care Services in various Wound Care Services target markets nationwide.  LDC registered

an assumed business name of "Nexus Marketing Management," which it used in providing services under the Agreement. At the time of the Agreement, Nexus had established the criteria for patients it was seeking (those with chronic wounds), and LDC was to build relationships with referral sources to ensure a steady stream of such patients to Nexus. This relationship enabled Nexus providers to deliver specialized Wound Care Services to patients who were referred through the established connections. Once a referral source was brought to Nexus by LDC, Nexus was responsible for maintaining and keeping the relationship.

13. As to compensation paid to LDC for the provision of marketing services under the Agreement, Article IV. – Service Fees reflects that "[LDC] shall not be entitled to any compensation, fees, or reimbursement of expenses in connection with the provision of the Marketing Services" under the Agreement. Rather, "the sole compensation due to [LDC] under this Agreement shall be an amount equal to forty percent (40.00%) ('Applicable Percentage') of Eligible Costs (the 'Services Fee') … 'Eligible Costs' means the aggregate costs incurred by [Odon] in respect of skin grafts, skin substitutes, or other similar biologics rendered to patients." For example, if Odon paid $1,000,000.00 for skin grafts in a month, LDC would receive $400,000.00 for that month as a Services Fee, to be paid by Odon to LDC within fifteen (15) days following the end of the calendar month to which such Services Fee relates. For its part, Odon would derive revenue from the Centers for Medicare & Medicaid Services ("CMS") reimbursement it received for application of the skin grafts.

14. To protect Odon's (and its subsidiaries and affiliates, including Nexus) Confidential Information, the Agreement contains certain Protective Covenants that LDC agreed to under Article VI., including "Confidential Information" and "Trade Secrets, Proprietary and Confidential Information" (Sections VI.1 and VI.2), "Limited Non-Compete" (Section VI.3), and

4

"Non-Solicitation; Non-Disparagement; Goodwill" (Section VI.4) clauses.  The "Confidential Information" and "Trade Secrets, Proprietary and Confidential Information" clauses reflect as follows:

> Section VI.1 Confidential Information. Contractor [LDC] expressly acknowledges that, pursuant to this Agreement, Contractor [LDC] and its respective equityholders, officers, directors, employees, agents and contractors will be given access to, and be provided with, business methods, trade secrets and other proprietary information of Client [Odon] in connection with performing this Agreement. Contractor [LDC] expressly acknowledges and agrees that Confidential Information, as defined below in Section 6.2, is proprietary and confidential and if any of the Confidential Information was imparted to or became known by any persons engaging in a business in any way competitive with that of Client [Odon], such disclosure would result in hardship, loss, irreparable injury and damage to Client, the measurement of which would be difficult, if not impossible, to determine. Accordingly, Contractor [LDC] expressly agrees that Client [Odon] has a legitimate interest in protecting the Confidential Information and its business goodwill, that it is necessary for Client [Odon] to protect its business from such hardship, loss, irreparable injury and damage, that the following covenants are a reasonable means by which to accomplish those purposes, and that violation of any of the protective covenants contained herein shall constitute a breach of trust and is grounds for immediate termination of the Agreement and for appropriate legal action for damages, enforcement and/or injunction.

> Section VI.2 Trade Secrets, Proprietary and Confidential Information. For purposes of this Agreement, "Confidential Information" is information obtained by Contractor from or regarding Client and includes, without limitation: (a) lists containing the names of past, present and prospective clients, patients, or suppliers; (b) the past, present and prospective methods, procedures and techniques utilized in identifying prospective clients or patients and in soliciting the business thereof; (c) the past, present and prospective methods, procedures and techniques used in the operation of Client's business, including, without limitation, the methods, procedures and techniques utilized in marketing, provision of services and pricing; (d) compilations of information, records and processes which are owned by Client and/or which are used in the operation of Client's business; and (e) any information directly or indirectly obtained pursuant to this Agreement; provided, however, that disclosure or release of such Confidential Information shall not be a breach of this Agreement if a court of competent jurisdiction orders its disclosure or release.

The "Limited Non-Compete" clause reflects as follows:

> Section VI.3 Limited Non-Compete. Contractor [LDC] covenants and agrees that it shall not, during the Term and for one (1) year following the termination or expiration of this Agreement, for any cause whatsoever, directly or indirectly, offer Marketing Services to any other person or entity providing (or managing or operating a provider of) Wound Care Services located in a State in which Client [Odon] or its affiliates conducts operations, as determined on the date of such termination or expiration of this Agreement.

The "Non-Solicitation; Non-Disparagement; Goodwill" clause reflects as follows:

Section VI.4 Non-Solicitation; Non-Disparagement; Goodwill. Contractor [LDC] covenants and agrees that it shall not, during the Term and for two (2) years following termination or expiration of this Agreement, for any cause whatsoever, directly or indirectly, take any action that constitutes, results or may reasonably be expected to result in: (a) soliciting, diverting or interfering with any relationship that Client [Odon] or any of its affiliates has with any patients, healthcare providers, referral sources, or suppliers; (b) soliciting the termination of, or diverting or interfering with any relationship that Client [Odon] has with any person or entity affiliated with it or any of its affiliates as an independent contractor, supplier or provider; (c) soliciting, inducing or encouraging any individual employed or engaged by or affiliated with Client [Odon] or any of its affiliates (presently or in the then most recent twelve (12) month period) to curtail or terminate such affiliation or employment, or take any action that results in, or might reasonably be expected to result in any employee or contractor ceasing to perform services for Client [Odon] or its affiliates; or (e) disparaging Client [Odon] or any of its affiliates, equityholders, officers, employees, agents or representatives. Nothing in this Section 6.4 is intended to prohibit ordinary course employment decisions or the placement of general advertisements for employment.

Moreover, the Agreement provides that these Protective Covenants shall survive the termination of the Agreement, and the existence of any claim or cause of action by either Party against the other Party, whether predicated on the Agreement or otherwise, shall not constitute a defense to the enforcement of such covenant.  The length of the Protective Covenants is also extended if LDC violates the Protective Covenants and Odon brings legal action for injunctive relief or other relief under the Agreement.

15.    The Agreement also contains numerous "for cause" termination provisions, including immediate termination of the Agreement by Odon "if Contractor [LDC] has committed fraud, any crime, willful misconduct, or negligence in the performance (or nonperformance) of its obligations hereunder or violates any applicable laws."  Not later than ten (10) days after termination for any reason or no reason, with or without cause, LDC was obligated to "(i) provide [Odon] with a schedule of Target Persons who [LDC] contacted throughout the term of the Agreement and those who [LDC] had taken steps to prepare to contact prior to the termination of the Agreement and (ii) return to [Odon] all marketing materials developed by [LDC] throughout the term of the Agreement and certify to [Odon] that [LDC] has destroyed or returned all

Confidential Information in its possession, custody or control immediately prior to the effective date of the termination of this Agreement." Upon termination of the Agreement, "[LDC's] right to compensation shall cease except for any amounts due and payable hereunder prior to the date of termination; provided that Client's obligation to continue to pay Compensation related to Eligible Costs incurred after the termination of this Agreement shall terminate in its entirety sixty (60) days after the termination or expiration of this Agreement."

### C. LDC's Immediate Request for Additional Funds to Provide Marketing Services and the Advance Agreement.

16.     Upon execution of the Agreement, LDC needed funds to get its operations up and running and commence providing Marketing Services to Odon. Accordingly, on October 31, 2023, only a week after the Agreement was executed, Odon advanced LDC $500,000 for that purpose, which advance was to be reconciled against what would be owed to LDC upon application of the 40% calculation. One month later, on December 1, 2023, Odon advanced another $500,000 to LDC for operations.

17.     In late 2023, C. Jurca engaged in communications with Dr. Jurca, as sole member of Odon, regarding LDC's costs. C. Jurca represented LDC needed additional sums of money to support and grow the marketing business and to adequately provide Marketing Services under the Agreement. C. Jurca explained the increased marketing efforts were expected to directly result in more patient referrals to Nexus which, in turn, would require Nexus to purchase more skin grafts to apply to its increased patient population. C. Jurca argued this would increase LDC's revenue because the costs against which the 40% multiplier was applied would increase, and Odon's revenue would also increase as a result.

18.     In reliance on C. Jurca's explanation of the need for and use of the additional monies to adequately grow and market the business, Dr. Jurca agreed that Odon would advance

additional funding in the form of increased advances against the monies that would be owed to LDC as the result of the expected increased revenue.  If the application of the 40% multiplier in a particular month resulted in a sum that exceeded the amount advanced, Odon would pay LDC the difference.  If the application of the 40% multiplier resulted in a sum less than the advanced amount, LDC would owe Odon the difference.  For example, if $400,000 was advanced in a certain month, and the 40% multiplier only resulted in an extra $300,000 in Eligible Costs, LDC would owe Odon $100,000 for that month.  However, if $400,000 was advanced in a certain month, and the 40% multiplier resulted in an extra $500,000 in Eligible Costs, Odon would owe LDC the extra $100,000 as a Service Fee for that month.

19.     Because the increased monies were advances unrelated to the compensation due under the Agreement, there was no need to amend the Agreement.  Thereafter, LDC issued monthly invoices to Odon for the increased amounts as unspecified "marketing services."  Due to many factors, including the familial relationship and trust between Odon's principals and LDC's principals, and the extreme workload and volume of patients Nexus was servicing on a monthly basis, Odon caused the invoices to be paid without question and did not immediately conduct an analysis of how the advanced monies were reconciled with the money owed under the Agreement's 40% Service Fee methodology.

### D. Odon Discovers LDC Owes Odon a Significant Amount under the Advance Agreement and LDC's Principals Used the Money Advance to Fund a Lavish Lifestyle; Odon Terminates the Agreement.

20.     In early 2025, Odon engaged in discussions with LDC to acquire LDC and bring LDC's marketing services in-house.  As part of a fair market evaluation of LDC's business, Odon requested to review LDC's books and financial records.  LDC agreed to allow Odon to do so.  LDC provided its books to Odon for review.

21.     Odon's new Chief Financial Officer reviewed the books and discovered that the monies advanced by Odon in 2024 and 2025 significantly exceeded the 40% of costs due under the Agreement, such that LDC owed Odon the difference between the amounts of the advances and the 40% of costs due under the Agreement for 2024 and 2025.  For 2024, Odon calculated that LDC was paid $3,056,026 more than LDC was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the Agreement by over $3 million.  For 2025, Odon calculated LDC was paid $2,257,203 more than it was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the agreement by over $2.25 million in the first couple of months of 2025.  Odon is still in the process of reconciling the numbers for 2023 but expects that LDC was significantly overpaid in 2023 as well.

22.     Odon also traced the overpaid funds after review of LDC's books and found that LDC sent substantial sums directly to companies owned by LDC principals C. Jurca and Padilla on a monthly, flat-fee basis.  Padilla's company, Jugo Juicery and Archie's Coffee, is in the coffee business, and C. Jurca's company, Alamo Prints, Inc., is in the custom card and stationary business.  This transfer of funds from LDC to C. Jurca's and Padilla's businesses is the method by which they funneled money to themselves to fund their lavish lifestyles.

23.     On or about March 20, 2025, Dr. Jurca, as sole member of Odon, sent notice to LDC's principals that Odon was terminating the Agreement effectively immediately for violation of Section V.3(c)(ii) providing for immediate termination if LDC commits "fraud, any crime, willful misconduct, or negligence in the performance (or non-performance) of its obligations."  Dr. Jurca, as sole member of Odon, communicated that from a recent review of LDC's books, he learned that vast amounts of increased monies (advances) were never invested in Nexus but were

rather paid out to LDC's principals in the amount of approximately $450,000.00 per month. Dr. Jurca, as sole member of Odon, provided a summary of the overpayments and included an overpayment reconciliation calculation reflecting the total amount of overpayments for the fiscal year 2024 through March 3, 2025. Dr. Jurca, as sole member of Odon, demanded that LDC reimburse the total amount of the overpayments within ten (10) calendar days.

24.     Dr. Jurca's calculation at that time did not include certain amounts that Odon has since found should be included as part of the overpayments. After further review, and based upon additional actual cost data received, Odon determined that the total amount owed by LDC exceeded $5.5 million rather than the approximately $4.9 million Dr. Jurca had originally demanded on behalf of Odon. To date, LDC has not reimbursed any of the total amount overpaid to LDC in fiscal year 2024 and in fiscal year 2025 up until March 3, 2025.

25.     Dr. Jurca, as sole member of Odon, also requested that LDC comply with Section V.4 of the Agreement requiring that within ten (10) calendar days of the date of termination, LDC provide to Odon: (i) a schedule of "Target Persons" who LDC contacted throughout the term of the Agreement and those who LDC had taken steps to prepare to contact prior to termination; (2) all marketing materials developed by LDC during the term of the Agreement; and (3) a certification that LDC has destroyed or returned all "Confidential Information" in its possession, custody or control as of the date of termination. To date, LDC has not complied with any of these provisions despite numerous requests from Odon.

### E.  LDC Violates the Non-Compete and Non-Solicitation Clauses of the Agreement and Continues to Take Steps to Assist Competitors in the Wound Care Services Industry.

26.     Moreover, despite the provisions in Sections VI.3 and VI.4 of the Agreement that both (i) prohibit LDC from marketing services for providers in the Wound Care Services industry during the term of the Agreement and for a period of one (1) year following the termination of the

Agreement in any State in which Odon or its affiliates (including Nexus) conduct operations; and (ii) prohibit LDC from soliciting any of Odon's or its affiliates (including Nexus) contractors, employees, suppliers, providers, or other client relationships during the term of the Agreement and for a period of two (2) years following the termination of the Agreement, LDC and its principals immediately began to take steps to compete against Odon and Nexus following the termination of the Agreement.  Examples of these improper acts include the following:

- On or about April 2, 2025, LDC filed an Abandonment of Assumed Name Certificate by which it abandoned the assumed name "Nexus Marketing Management."  This followed its filing on March 17, 2025 – even before Odon terminated the Agreement – of a new Assumed Name Certificate reflecting "Noble Management & Marketing" as a name under which LDC would conduct business and indicated its intent to conduct business under that name throughout "all counties" in Texas, which is prohibited by the protective covenants contained in the Agreement.

- On or about April 29, 2025, C. Jurca posted on her LinkedIn social media page that she was hiring for an Advanced Wound Care Provider position in San Antonio, Texas and Austin, Texas on behalf of a direct competitor of Odon and Nexus in the Wound Care Services industry, Trinity Mobile Wound Care – these are the exact same types of services LDC performed for Odon under the Agreement.  *See* "Exhibit B," attached hereto.

- C. Jurca has recently been assigned a formal email address with Trinity Mobile Wound Care, evidencing her formal agreement to provide marketing services on behalf of this direct competitor.

- A former medical provider who performed services for Nexus is now working for Trinity Mobile Wound Care and, on information and belief, C. Jurca solicited this former employee to come to work for Trinity Mobile Wound Care.

- C. Jurca is also contacting and soliciting former marketeers of LDC – who now provide marketing services for Odon and Nexus and/or who previously worked for Odon and Nexus during the period of the non-solicitation clause – to come back to work for LDC.

27.    On information and belief, LDC is continuing to solicit Odon's and its affiliates' (including Nexus) contractors, employees, suppliers, providers, and other client relationships and continuing to compete by providing marketing services to Odon's competitors in the Wound Care Services industry, in violation of the "Limited Non-Compete" (Section VI.3), and "Non-Solicitation; Non-Disparagement; Goodwill" (Section VI.4) clauses in the Agreement.  Moreover, to date, LDC has failed to comply with the terms of the Agreement providing that within ten (10) calendar days of the date of termination, LDC provide to Odon: (i) a schedule of "Target Persons" who LDC contacted throughout the term of the Agreement and those who LDC had taken steps to prepare to contact prior to termination; (2) all marketing materials developed by LDC during the term of the Agreement; and (3) a certification that LDC has destroyed or returned all "Confidential Information" in its possession, custody or control as of the date of termination, in violation of the "Obligations Upon Termination" (Section V.4) provisions in the Agreement.  On information and belief, LDC refuses to return Odon's (and Nexus') marketing materials and is using Odon's (and Nexus') Confidential Information, including its proprietary processes, to provide marketing services for competitors in the Wound Care Services industry, including Trinity Mobile Wound Care, and to solicit Odon's (and Nexus') contractors, employees, suppliers, providers, and other

client relationships, in violation of the "Confidential Information" (Section VI.1) and "Trade Secrets, Proprietary and Confidential Information" (Section VI.2) clauses in the Agreement.

## IV.
## CAUSES OF ACTION

**i.    Breach of Contract**

28.    Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

29.    Odon and LDC entered into an Exclusive Marketing Agreement ("Agreement") effective October 20, 2023.  As part of the Agreement, in exchange for a Service Fee, LDC agreed to perform Marketing Services (as defined above).  LDC also agreed to certain obligations upon termination and certain protective covenants during the term of the Agreement and for a reasonable time period thereafter.

30.    As part of the Agreement, under the "Confidential Information" (Section VI.1) and "Trade Secrets, Proprietary and Confidential Information" (Section VI.2) clauses, LDC agreed not to disclose Odon's (and its affiliates, including Nexus) Trade Secrets, Proprietary and Confidential Information (as defined above) to any third parties, both during the term of the Agreement and after termination of the Agreement.

31.    Under the "Limited Non-Compete" (Section VI.3) clause, LDC agreed that during the term of the Agreement and for one (1) year following the termination of the Agreement, it would not provide Marketing Services (as defined above) to any other person or entity providing (or managing or operating a provider of) Wound Care Services located in a State in which Odon or its affiliates (including Nexus) conducts operations, as determined on the date of such termination or expiration of the Agreement.

32.     Under the Non-Solicitation; Non-Disparagement; Goodwill" (Section VI.4) clause, LDC agreed that during the term of the agreement and for two (2) years following the termination of the Agreement, it would not take any action that constitutes, results or may reasonably be expected to result in: (a) soliciting, diverting or interfering with any relationship that Odon or any of its affiliates (including Nexus) has with any patients, healthcare providers, referral sources, or suppliers; (b) soliciting the termination of, or diverting or interfering with any relationship that Odon (and its affiliates, including Nexus) has with any person or entity affiliated with it or any of its affiliates as an independent contractor, supplier or provider; (c) soliciting, inducing or encouraging any individual employed or engaged by or affiliated with Odon or any of its affiliates (including Nexus) (presently or in the then most recent twelve (12) month period) to curtail or terminate such affiliation or employment, or take any action that results in, or might reasonably be expected to result in any employee or contractor ceasing to perform services for Odon or its affiliates (including Nexus); or (e) disparaging Odon or any of its affiliates, equityholders, officers, employees, agents or representatives (including Nexus).

33.     The Covenant Not to Compete and Non-Solicitation restrictions are ancillary to or part of the Exclusive Marketing Agreement, which is an otherwise enforceable agreement.  The Covenant Not to Compete and Non-Solicitation provision restrictions are reasonable.  One (1) and two (2)-year restrictions are commonly used time limitations which have been held to be reasonable by multiple Texas federal and state courts.  The geographic scope is reasonable because the Covenant Not to Compete is limited to the handful of States in which Odon or its affiliates (including Nexus) conducted business in the Wound Care Services industry as of the date of the termination of the Agreement, and the Non-Solicitation is limited to Odon's (and its affiliates, including Nexus) patients, healthcare providers, referral sources, suppliers, providers, independent

contractors, and employees in the Wound Care Services industry, all of whom LDC would have had contact with during the term of the Agreement as the exclusive marketeer for Odon, Nexus, and affiliates. Under Texas law, reasonable geographic scope in a covenant not to compete/non-solicitation is generally considered the territory in which the employee or contractor worked for the employer. *See* Tex. Bus. & Comm. Code § 15.50(a).

34.     The scope of activity restrictions are reasonable in that they only restrict LDC from providing Marketing Services to any other person or entity providing (or managing or operating a provider of) Wound Care Services and/or soliciting Odon's (and its affiliates, including Nexus) patients, healthcare providers, referral sources, suppliers, providers, independent contractors, and employees in the Wound Care Services industry. Moreover, Section I.2 of the Agreement provides that LDC is free to perform marketing services to any other client who is not engaged in the provision of Wound Care Services or the management or operation of providers of Wound Care Services. These restrictions are necessary to protect Odon's (and its affiliates, including Nexus) legitimate business interests in the Wound Care Services industry and by limiting the restrictions to Odon's (and its affiliates, including Nexus) direct competitors and business and employment relationships in the Wound Care Services industry, do not impose a greater restraint than necessary.

35.     Following termination of the Agreement, LDC, through its principals, breached the Agreement by:

- Filing a new Assumed Name Certificate reflecting "Noble Management & Marketing" as a name under which LDC would conduct business, and indicating its intent to conduct business under that name throughout "all counties" in Texas.

15

- Advertising for various open Advanced Wound Care Provider and related positions in San Antonio, Texas and Austin, Texas on behalf of a direct competitor in the Wound Care Services industry, Trinity Mobile Wound Care, thereby providing the exact same services for a competitor that LDC performed for Odon under the Agreement.

- On information and belief, entering into a formal Marketing Agreement to provide marketing services in the Wound Care Services industry on behalf of direct competitor Trinity Mobile Wound Care.

- On information and belief, soliciting a former medical provider who performed services for Nexus to perform services for Trinity Mobile Wound Care.

- Contacting and soliciting former marketeers of LDC – who now provide marketing services for Odon and Nexus and/or who previously worked for Odon and Nexus during the period of the non-solicitation clause – to come back to work for LDC.

36.    On information and belief, LDC is continuing to solicit Odon's (and its affiliates, including Nexus) contractors, employees, suppliers, providers, and other client relationships and continuing to compete by providing marketing services to Odon's (and its affiliates, including Nexus) competitors in the Wound Care Services industry, in violation of the "Limited Non-Compete" (Section VI.3), and "Non-Solicitation; Non-Disparagement; Goodwill" (Section VI.4) clauses in the Agreement.

37.    Under the "Obligations Upon Termination" (Section V.4) clause, LDC agreed that, upon termination of the Agreement, within ten (10) calendar days of the date of termination, it provide to Odon: (i) a schedule of "Target Persons" who LDC contacted throughout the term of the Agreement and those who LDC had taken steps to prepare to contact prior to termination; (2)

all marketing materials developed by LDC during the term of the Agreement; and (3) a certification that LDC has destroyed or returned all "Confidential Information" in its possession, custody or control as of the date of termination. To date, LDC has failed to comply with this provision. LDC has not provided a list of "Target Persons" who it contacted during the term of the Agreement and those who it had taken steps to prepare to contact prior to termination of the Agreement. LDC has not provided any marketing materials developed by LDC on Odon's behalf during the term of the Agreement. LDC has not provided a certification that it has destroyed or returned all "Confidential Information" in its possession, custody, or control. Instead, on information and belief, LDC refuses to return Odon's marketing materials and is using Odon's Confidential Information, including its proprietary processes and lists of current and potential referrals, to provide marketing services for competitors in the Wound Care Services industry, including Trinity Mobile Wound Care, and to solicit Odon's contractors, employees, suppliers, providers, and other client relationships to go to work for LDC and/or other direct competitors.

38.    On information and belief, these violations of the Covenant Not to Compete/Non-Solicitation provisions and improper use of Odon's Confidential Information and Trade Secrets proximately caused, contributed to or resulted in unknown and continuing damages to Odon, including but not limited to lost profits in the form of lost referrals and lost providers in the Wound Care Services industry, that are not readily capable of calculation at this time.

39.    LDC has also breached Article IV – Services Fees by taking additional monthly compensation over and above the 40% of Eligible Costs per month agreed to by the parties. Moreover, to the extent the parties later came to a verbal agreement regarding the advance of additional money following entering into the Agreement, LDC breached that agreement by accepting advances of money from Odon in 2024 and 2025 that significantly exceeded the 40% of

costs due under the Agreement, such that LDC owed Odon the difference between the amounts of the advances and the 40% of costs due under the Agreement for 2024 and 2025. In 2024, LDC was paid $3,056,026 more than LDC was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the Agreement by over $3 million. In 2025, LDC was paid $2,257,203 more than it was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the agreement by over $2.25 million in the first two (2) months of 2025. On information and belief, LDC was significantly overpaid in 2023 as well. Odon has sent LDC a written demand for reimbursement and recoupment of these significant overpayments, but LDC has failed and refused to repay these monies.

40.    LDC has breached these provisions of the Agreement. These breaches have proximately caused Odon (and its affiliates, including Nexus) to incur damages, including but not limited to loss of profits, disruption of business operations and loss of goodwill as stated above. All conditions precedent have been performed or have occurred.

41.    Moreover, to the extent it is found that a verbal advance agreement and valid contract was entered into between Odon and LDC, LDC breached the terms of such verbal agreement by failing to utilize the money for its intended purpose and failing to pay back the amounts of the advances according to the terms agreed to by the parties. These breaches have proximately caused Odon (and its affiliates, including Nexus) to incur damages in the total amount of the overpayment to LDC.

**ii.    Fraudulent Misrepresentation, Fraudulent Inducement, and Piercing the Corporate Veil**

42.    Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

43.    LDC and its principal, C. Jurca,, engaged in fraudulent misrepresentation when, in late 2023, she engaged in communications with Dr. Jurca, acting in his capacity as sole member of Odon, regarding LDC's need for increased compensation under the Agreement.  C. Jurca represented to Dr. Jurca that LDC needed additional sums of money advanced to support and grow the marketing business and to adequately provide Marketing Services under the Agreement.  C. Jurca explained the increased marketing efforts were expected to directly result in more patient referrals to Nexus which, in turn, would require Nexus to purchase more skin grafts to apply to its increased patient population.  C. Jurca argued this would increase LDC's revenue because the costs against which the 40% multiplier was applied would increase, and Odon's revenue would also increase as a result.  This representation was material because a reasonable person would attach importance to it and would be induced to act on the information in determining his choice of actions in the transaction in questions.

44.    This material representation by C. Jurca was false because Odon later discovered that the monies advanced by Odon in 2024 and 2025 and requested by C. Jurca significantly exceeded the 40% of costs due under the Agreement, such that LDC owed Odon the difference between the amounts of the advances and the 40% of costs due under the Agreement for 2024 and 2025.  For 2024, LDC was paid $3,056,026 more than LDC was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the Agreement by over $3 million.   For 2025, LDC was paid $2,257,203 more than it was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the agreement by over $2.25 million in the first couple of months of 2025.  On information and belief, LDC was significantly overpaid in 2023 as well.

45.    Furthermore, these overpaid monies were not utilized to market and grow the business.  Instead, the monies were used by LDC's principals, C. Jurca, I. Jurca, and Padilla, to fund their lavish lifestyles.  In some months, Payments transferred by LDC's principals, C. Jurca and Padilla, to their personal companies totaled as much as $450,000.  C. Jurca, I. Jurca, and Padilla attempted to hide the fact that they were transferring the payments to themselves by transferring substantial sums from LDC directly to companies owned by LDC principals C. Jurca and Padilla on a monthly, flat-fee basis.  Padilla's company, Jugo Juicery and Archie's Coffee, is in the coffee business, and C. Jurca's company, Alamo Prints, Inc., is in the custom card and stationary business. These transfers of funds from LDC to C. Jurca's and Padilla's businesses is the method by which they funneled money to themselves to fund their lavish lifestyles.

46.    These later actions in transferring the money to C. Jurca's and Padilla's own private businesses demonstrate C. Jurca knew her material and false representations to Dr. Jurca, acting in his capacity as the sole member of Odon, regarding the needs for and use of the additional advanced funds was false when she made the statements or she made the statements without any knowledge of their truth, and that she made the representations with the intention that the statements be acted upon by Odon.  Unquestionably, Dr. Jurca, acting in his capacity as the sole member of Odon, acted in reliance upon C. Jurca's representation because Odon paid monthly advances to LDC from October 2023 until early March 2025.  Odon suffered damages because it significantly overpaid LDC what was due under the terms of the Agreement.

47.    To the extent it is found that a verbal advance agreement and valid contract was entered into between Odon and LDC C. Jurca also engaged in fraudulent inducement when she made the above misrepresentations.  Such verbal agreement entailed that Odon would provide additional funding in the form of a monthly advance against the monies that would be owed to

LDC as the result of the increased revenue. Odon would not have agreed to advance the money if C. Jurca had not made the false and material representations that the advance money would be used to fund and grow Odon's business.

48.    If the application of the 40% multiplier in a particular month resulted in a sum that exceeded the amount advanced, Odon would pay LDC the difference. If the application of the 40% multiplier resulted in a sum less than the advanced amount, LDC would owe Odon the difference. For example, if $400,000 was advanced in a certain month, and the 40% multiplier only resulted in an extra $300,000 in Eligible Costs, LDC would owe Odon $100,000 for that month. However, if $400,000 was advanced in a certain month, and the 40% multiplier resulted in an extra $500,000 in Eligible Costs, Odon would owe LDC the extra $100,000 as a Service Fee for that month. In every month from October 2023 until early March 2025, application of the 40% multiplier resulted in a sum less than the advanced amount, such that LDC owed Odon the difference. C. Jurca did not reveal these significant overpayments to Odon with the intent that LDC's principals would keep the money.

49.    These facts also demonstrate that C. Jurca, on behalf of herself, I. Jurca, and Padilla, engaged in actual fraud for their direct personal benefit. In other words, C. Jurca was dishonest of purpose or intent to deceive and the actual fraud was specifically related to the Exclusive Marketing Agreement at issue and, to the extent Odon and LDC entered into a later verbal agreement regarding the advance of monies, the actual fraud was also directly related to such contract. As a result, the corporate veil should be pierced, and C. Jurca, I. Jurca, and Padilla should be held individually liable as the Managers/Directors of LDC for the debts of LDC, including all overpayments made to LDC and for any and all damages resulting from LDC's breaches of the Exclusive Marketing Agreement and any verbal advance agreement as described above.

### iii.    Negligent Misrepresentation

50.    Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

51.    Alternatively, to the extent C. Jurca's representations to Dr. Jurca, acting in his capacity as the sole member of Odon, regarding the need for the advance of monies as outlined above did not involve a specific intent to decide and knowledge of a falsehood at the time the material representations were made, such representations were negligent misrepresentations.  C. Jurca made false material representations in the course of LDC's business as evidenced by LDC's failure to use the advance monies to market and grow the business and instead pocketing the overpayments, C. Jurca supplied false information to Dr. Jurca, acting in his capacity as the sole member of Odon, for the guidance of Odon and its affiliates in their business, C. Jurca failed to exercise reasonable care in obtaining or communicating accurate information and, as described above, Odon and its affiliates suffered pecuniary loss in the form of significant overpayments to LDC by justifiability relying on C. Jurca's representations.  Further, once C. Jurca realized her statements were false and LDC was receiving overpayments from Odon, C. Jurca did not exercise her duty to correct her own prior false and misleading statements.

### iv.    Unjust Enrichment/*Quantum Meruit*/Money Had and Received/Restitution

52.    Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

53.    Alternatively, to the extent that the verbal communications between C. Jurca and Dr. Jurca, acting as sole member on behalf of Odon, regarding the advance of additional monies do not constitute a verbal agreement and binding contract between Odon and LDC, LDC and LDC's principals, including C. Jurca, I. Jurca, and Padilla, unjustly profited from Odon's loss as

the result of LDC obtaining an improper benefit from Odon by fraud or the taking of an undue advantage.

54.     More specifically, following C. Jurca's explanation of the need for and use of the additional monies to adequately grow and market the business to Dr. Jurca, Odon agreed to provide increased advances against the monies that would be owed to LDC under the 40% calculation.

55.     Some or all of these amounts of increased monies (advances) were never invested by LDC in Odon and its Nexus affiliates but were rather paid out directly by LDC to LDC's principals, C. Jurca, I. Jurca, and Padilla, in amounts up to $450,000.00 per month, for their own personal use and benefit.  All told, in 2024, LDC was paid $3,056,026 more than LDC was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the Agreement by over $3 million.  In 2025, LDC was paid $2,257,203 more than it was due under the Agreement, such that the total amount of advances by Odon exceeded the 40% of costs due under the agreement by over $2.25 million in the first two (2) months of 2025.  Odon has demanded that LDC reimburse the $5,313,229 overpayment.  To date, LDC has not reimbursed any of the $5,313,229 amount overpaid to LDC in fiscal year 2024 and in fiscal year 2025 up until March 3, 2025.  LDC and its principals, C. Jurca, I. Jurca, and Padilla, have been unjustly enriched in this amount.  Odon seeks restitution from LDC and its principals, C. Jurca, I. Jurca, and Padilla, in this amount.

56.     Odon further complains that it is entitled to recover from LDC and its principals, C. Jurca, I. Jurca, and Padilla, by *quantum meruit*.  The above facts show that Odon rendered advances of money to LDC for the purpose of marketing and growing the business.  LDC accepted the money, and LDC was reasonably notified that Odon expected to received an increase in Eligible Costs consistent with the amounts of the advance payments or else LDC would be

expected to reimburse Odon for any amounts resulting in a sum less than the advanced amount after application of the 40% multiplier.  Moreover, LDC unquestionably received money in the form of overpayments that belonged to Odon in equity and good conscience.  Odon seeks restitution from LDC and its principals in the amount of at least $5,313,229 based upon *quantum meruit* and money had and received claims.

**v.    Civil Conspiracy**

57.    Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

58.    LDC's principals, C. Jurca, I. Jurca, and Padilla, agreed in advance to commit unlawful acts – including fraud, knowingly accepting overpayments to use for their own benefit, and violation of the non-compete, non-solicitation, and confidentiality provisions of the Exclusive Marketing Agreement – against Odon and its affiliates, including Nexus.  LDC's principals acted in furtherance of the conspiracy, including by transferring money belonging to Odon that was advanced for marketing purposes to C. Jurca's and Padilla's own private companies and by marketing Wound Care Services on behalf of a competitor following termination of the Exclusive Marketing Agreement.

59.    The conspiracy was a proximate cause of Odon's losses in this case, including lost profits, goodwill, and overpayment of at least $5,313,229 to LDC and its principals, C. Jurca, I. Jurca, and Padilla.  LDC and its principals should be held personally and joint and severally liable for all such damages.

**vi.    Temporary Restraining Order and Preliminary and Permanent Injunctive Relief**

60.    Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

61.     Pursuant to Federal Rule of Civil Procedure 65 and general principles of equity, Odon requests that the Court enter a temporary restraining order, preliminary injunction, and permanent injunction to prevent LDC, its principals, including C. Jurca, I. Jurca, and Padilla, and its employees and agents as more specifically described in its Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, filed contemporaneously herewith.

## V.
## DAMAGES

62.     Odon incorporates by reference each of the preceding paragraphs as though fully set forth herein.

63.     Odon hereby seeks the following damages, jointly and severally, from LDC and each of LDC's principals individually, including C. Jurca, I. Jurca, and Padilla:

a.      Actual damages, including consequential damages, resulting from or proximately caused by LDC's, C. Jurca's, I. Jurca's, and/or Padilla's wrongful actions as described in this Complaint in an amount not less than $6,000,000.

b.      Exemplary and punitive damages as the result of the willful, malicious, and fraudulent conduct on the part of LDC, C. Jurca, I. Jurca, and/or Padilla.

c.      Attorney's fees, costs, and expenses based upon the Agreement as set forth in this Complaint pursuant to Tex. Civ. Prac. & Rem. Code 38.001.

d.      Prejudgment and post-judgment interest.

e.      Equitable relief in the form of disgorgement of profits and an order of restitution of all ill-gotten gains.

## VI.
## <u>PRAYER FOR RELIEF</u>

64.     Odon Holdings LLC respectfully requests that LDC Health Solutions LLC, Christiana Jurca, Isaiah Jurca, and David Padilla be cited to appear and answer and that the Court award Odon Holdings LLC judgment for the following:

        a.     All actual and consequential damages;

        b.     Exemplary damages;

        c.     Attorney's fees;

        d.     Prejudgment and post-judgment interest; and

        e.     Costs.

65.     Odon Holdings LLC further requests that LDC Health Solutions LLC, Christiana Jurca, Isaiah Jurca, and David Padilla be required to disgorge the profits and benefits they have obtained as a result of their unlawful conduct described herein, and provide restitution to Odon Holdings LLC for all ill-gotten gains.

66.     Odon Holdings LLC requests that the Court issue a temporary restraining order, temporary injunction, and permanent injunction against LDC Health Solutions LLC, Christiana Jurca, Isaiah Jurca, and David Padilla as more particularly described in its Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, filed contemporaneously herewith.

67.     Odon Holdings LLC further requests all other equitable and legal relief to which it is justly entitled.

Respectfully submitted,

**LANGLEY & BANACK, INC.**

BY:   */s/ Roger D. Kirstein*
          **ROGER D. KIRSTEIN**
          Texas Bar No. 11533700
          rkirstein@langleybanack.com
          **DYLAN O. DRUMMOND**
          Texas Bar No. 24040830
          ddrummond@langleybanack.com
          **MARK A. McNITZKY**
          Texas Bar No. 24065730
          mmcnitzky@langleybanack.com
          745 East Mulberry, 7th Floor
          San Antonio, Texas 78212
          Telephone: (210) 736-6600
          Facsimile: (210) 735-6889

          **ATTORNEYS FOR DEFENDANT**
          **ODON HOLDINGS LLC**

## <u>CERTIFICATE OF NOTICE</u>

Pursuant to Federal Rule of Civil Procedure 65, I hereby certify that I gave notice to Defendants LDC Health Solutions LLC, Christiana Jurca, Isaiah Jurca, and David Padilla on May 20, 2025 of Plaintiff Odon Holdings LLC's intent to file this suit and its intent to seek a temporary restraining order.  I gave notice by means of an electronically transmitted copy of the Complaint to be filed herein via email to the attorneys for LDC Health Solutions LLC, Christiana and Isaiah Jurca David Padilla: Derek R. Staub (dstaub@fbtlaw.com) and Colin Walsh (cwalsh@kherkhergarcia.com).

          */s/ Roger D. Kirstein*
          ROGER D. KIRSTEIN

## VERIFICATION

STATE OF IDAHO                          §
                                        §
COUNTY OF ADA                           §

     BEFORE ME, the undersigned authority, on this day personally appeared Samuel Jurca, D.O., Manager of Odon Holdings, LLC, who by me being duly sworn as the corporate representative of Odon Holdings LLC, with authority to execute this Verification on behalf of same, testified that he has read the foregoing *Plaintiff's Original Verified Complaint*, and that all the factual matters stated in Section III., "Background Facts" are within his personal knowledge and are true and correct.

_____
Samuel Jurca, D.O.

     SUBSCRIBED AND SWORN TO before me on this the ___19___ day of May 2025, to certify which witness my hand and seal of office.

```
MEAGHAN MALIN
Notary Public - State of Idaho
Commission Number 20241692
My Commission Expires May 9, 2030
```

_____
Notary Public – State of Idaho